## Universal Credit Co. v. Big Sandy Auto Co.

(Decided Oct. 6, 1933.)

WARE & WARE for appellant.

WHEELER & WHEELER for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

The appellant, which we shall refer to as the credit company, seeks to reverse a judgment for $632.92 recovered against it by the appellee.

The appellee, which we shall call the dealer, was the local agent of the Ford Motor Company; it sold automobiles on credit, taking from the purchasers conditional sales contracts, which contracts the dealer sold to the credit company and guaranteed the payment thereof.

Six men who had purchased automobiles from the dealer wrecked their machines and defaulted in their payments, and another defaulted without wrecking his car, and, as the dealer refused to pay the balances due on these contracts, the credit company sued the dealer thereon to recover these balances, which aggregated $1,340.33. The dealer answered and asserted divers sums it claimed were due it from the credit company,

but what ones and how many of these were allowed by the trial court is not disclosed by the record.

### Plan of Dealing.

In their dealings with each other, these parties operated under a plan embodied in what is known as "Confidential Pamphlet 'A.'" This pamphlet contained these provisions:

> "While the statements as to the methods of settlement outlined herein are necessarily in technical form, the actual adjustments will be made on a basis which will be entirely fair to the dealer and always with the idea in mind of protecting the dealer to the greatest extent possible."

> "Loss resulting from collision will be deemed to exist only when the purchaser is unable to meet his obligation and the car is recovered as the direct result of a collision. In such case the purchaser is not protected, but the dealer is protected as outlined herein."

> "No protection against loss from conversion, confiscation and/or collision is in effect for dealers when any of the following conditions exist: (a). When these forms of dealer protection have been made known to the purchaser by the dealer or by any member of the dealer's organization."

From this it is evident this pamphlet was drawn solely in the interests of the credit company and the dealer. When an automobile was sold on time, there was added to the cash price a sum which we shall call the financing load, and we shall try to illustrate what that was for and how it was distributed by one of the transactions appearing in this record.

A 1½-ton truck was sold for ............................. $809.36
There was paid in cash ................................... 498.36

Leaving a balance of ..................................... $311.00,
But the purchaser signed a contract for .................. $360.00
Thus there was a financing load of ....................... $ 49.00.

This financing load was for these purposes: $9.67 was set aside in a reserve fund; $16.25 was paid for fire and theft insurance; $——— was to cover risk of collision; $——— was to cover risk of confiscation; $——— was to cover risk of conversion; $——— was to cover interest.

### Refunds.

The dealer in its answer, counterclaim, and cross-petition set up many things, and among these it made six claims of refund on account of financing loads aggregating $210.08. We shall give one example which will be illustrative of the others:

A machine was sold to Charles H. Young, and into the conditional sales contract there was put a financing load of $44. After this machine had been run about 60 days, it was wrecked, and the dealer is claiming a return of $36.66, which it arrives at in this way: This financing was to cover a period of twelve months. In sixty days the machine was wrecked; therefore there was, so it says, no financing for the other ten months, and hence it was entitled, so it claims, to a return of ten twelfths of this $44, which is $36.66.

In this confidential pamphlet A there is this provision:

"In every case where dealer himself makes a repossession in place of U. C. C. and pays immediately the outstanding balance as shown by the books of U. C. C., he will be allowed credit for the anticipation refund which will be figured on the same basis as a purchaser's prepayment refund, shown in 'Handbook of Information' under heading 'Refund for Anticipated Payments.' If U. C. C. makes the repossession, U. C. C. will retain the anticipation refund."

Thus it will be seen that a dealer, to be entitled to a refund, must do two things: He must repossess the car, and he must pay immediately the outstanding balance. In this case the dealer did make some of the repossessions, but he did not pay the outstanding balances; hence he was not entitled to any refunds.

### Towage.

The dealer claimed two items, one of $10 and another of $15, paid for towing in wrecked cars. In this confidential pamphlet A there is this provision:

"If a car is recovered as a result of a collision, dealer agrees to take the car into his place of business and provide shelter and protection from further damage without charge. Dealer will notify U. C. C. immediately and repairs are not to be undertaken until the damages due to the collision and

which caused the default have been determined and approved in writing for the repair work given by a U. C. C. representative."

Our construction of this is that this requires the dealer to do three things without charge: To take the wreck to his place of business, to keep it there, and to immediately notify the credit company. The claim for towage cannot be allowed.

### Advance Payments.

The dealer had some five cars on its floors which it had obtained in this manner: It deposited with the credit company 10 per cent. of the list price of the cars, the credit company paid the balance, and the cars were shipped to the latter by the Ford Motor Company, and the dealer obtained them from it under a trust agreement wherein, among other things, the dealer agreed:

> "To take and hold the same, at my (our) sole risk as to loss or injury, for the purpose of storing said property; and I (we) hereby agree to keep said Motor Vehicles brand new and not to operate them for demonstrating or otherwise."

> "I (we) hereby agree not to sell, loan, deliver, pledge, mortgage, or otherwise dispose of any of said motor vehicles to any other person until after payment of corresponding amount shown on Dealer's Record of Purchase and Release of like identification number herewith."

One of these cars upon which the dealer had made a payment of $54 had a balance of $492 due thereon. The dealer either sold it to Mr. K. B. Collins or let Mr. Collins take it out, without first settling therefor. The credit company found this car in Prestonsburg, and it repossessed it and brought it to Paintsville. The dealer gave the credit company its check for $492. The check was not paid when presented; thereupon the credit company again repossessed the car and sold it in Huntington, W. Va., for $450, thus leaving a balance of $42, which it is asserting against the dealer.

The dealer claims this $42, $12.50 for a tire it had put on this car, $22.50 for freight (see discussion of freight claims later), $54 advance payment, and $125 sales profits, or a total of $256.00, to none of which was it entitled.

These cars belonged to the credit company. Under

a trust agreement the dealer executed in order to obtain them, he became only the conditional owner of them. See White v. General Motors Acceptance Corporation (D. C.) 2 F. Supp. 406.

The conditions under which the dealer had these cars are sharply defined by the trust agreement, a part of which we have copied above. The things permissible by the trust agreement the dealer could do, the things forbidden it could not do, and nowhere can the dealer show any right in it to put accessories on these cars or to sell them without first paying to the credit company what is due it thereon. If it put an extra tire on one of them and turned the car over to Collins, without first having acquired free title to the car and right to sell it by paying what was to be paid the credit company under the trust agreement, it did so at its own risk. As to the $42 claim, there is no way for it to be entitled to credit for that. The $22.50 we will consider later, and, as to the $125 profit, before the dealer can be entitled to a profit, it must have a car and have the right to sell and deliver it, and it had not such right as to this one. The $54 deposit will be disposed of further on.

There were four other cars on the dealer's floors when the Ford Motor Company discontinued it as the Ford agent.

The original list price of these cars was ......$2,085.82
The dealer had paid thereon ...............  241.82

Leaving a balance on trust agreement of .....$1,844.00

At the time when the Ford agency was taken from the dealer, the list price on these cars had been reduced from $2,085.82 to $2,066.12, or a reduction on these four cars of $19.70. Out of the $2,066.12 for which the credit company sold these cars, it deducted the $1,844 due it on the trust agreement, and gave the dealer credit for the $212.12 remaining. The dealer says the Ford Motor Company agreed when it took the agency to take off of its hands at the original list price any cars on hand when the agency was discontinued; hence it says this $19.70 should not be charged to it, but the Ford Motor Company is not a party to this suit, and these cars were not turned over to it. The dealer made no objection to turning these cars over to the credit company, and, as it got for them what was then the full list price, we cannot see how the dealer has been hurt, but

it says it made a down payment of $241.82 and only gets back $212.12 and thus sustains a loss of $29.40. We have already shown where $19.70 of this loss came from, and the remaining $9.70 is a small and a fair charge for carrying these cars while the dealer had them on its floors. The credit of $212.12 is all it is entitled to.

### Freight Charge.

The dealer says it bought these cars at a list price f. o. b. Cincinnati, and that under its contract with the Ford Motor Company it was allowed to add $22.50 to the retail price of each car in Cincinnati, and that made the retail price in Paintsville. As between the dealer and the purchaser, that is true, but that is no reason it should be given a credit for five times $22.50, or $112.50, against the credit company; moreover, under the trust agreement, any expense to which the credit company is put in repossessing its property is to be deducted from the deposit the dealer made when he got the cars; so, if this $112.50 for freight were allowed, we would be compelled to deduct it from the $212.12 credit allowed above under the terms of the trust agreement, and the same is true of the $54 deposit made on the K. B. Collins car. These freight claims are not allowed.

### C. H. Kemper Wreck.

This car was wrecked; the credit company offers to allow a credit for repairs of $70, and the dealer demands $186.42, but in this is $10 for towage and $20.42 for refund, and these two items have been decided against the dealer. That leaves $151 which the dealer claims is the cost of repairing the car, but from the extract first copied above from this pamphlet A it will be seen no repairs are to be undertaken until the damages due to the collision have been determined and approved in writing by the credit company. No such writing appears, there is no list of what was done to or put on the car and no proof the prices were reasonable, nor does the dealer show Kemper is unable to meet his obligation. The dealer must be content with the $70 credit.

### The Greenville Meeks Wreck.

The dealer claims $100.97 for these repairs, but, deducting $10 claimed for towage leaves a balance of $90.97. In the confidential pamphlet A it is provided:

"The amount of the credit will be determined on the basis of dealer's actual cost of labor and material in repairing actual damage resulting directly from the collision, less $25.00, but in no event to exceed the outstanding balance of the obligation."

Deducting this $25 which the dealer must bear leaves $65.97. The credit company admits a credit of $66 is due, and that is approved.

### The Chapman Adkins Car.

A claim is made of $78 for two payments made thereon by the dealer, but a credit of $78 has already been given on the sales contract, and hence should not be given again. The credit company admits that after this suit was brought a payment of $195 was made on this contract and that credit is now allowed.

### The Ray Salyer Car.

The parties agree the dealer is entitled to $129 on this account, and it is allowed.

### G. C. Cornett Wreck.

The dealer claims $113.51; this includes a refund of financing load of $34. When this $34 is deducted, the claim is reduced to $79.51, and, when the dealer's $25 deductible is taken out, this claim is reduced to $54.51 which the credit company admits, and that is allowed.

### Cecil Short Wreck.

$214 is claimed for this, but $49 of it is for refund of financing load, which we have decided cannot be allowed. That leaves $165 claimed for repairs, but these repairs were made without any authority to make them being obtained, there is no showing Mr. Short is unable to meet his obligations, and this claim cannot be allowed.

### Claim on Reserve Fund.

This is for $552, and it is admitted there is that much due the dealer.

These credits total $1,278.63, and, when that is deducted from the $1,340.33 sued for, there is left a balance due the credit company, of $61.70, for which the court will award it a judgment.

Judgment reversed, with directions to enter a judgment as indicated.